(57 Misc. Rep. 30.)

### PEOPLE ex rel. JENKINS v. KUHNE.

(Supreme Court, Special Term, Kings County. December 17, 1907.)

1. HABEAS CORPUS—REQUISITES—SEAL.
Though a writ of habeas corpus is required, by Code Civ. Proc. § 1992, to be issued under the seal of the Supreme Court, section 24 also declares that the omission of the seal does not render the writ void or voidable.
[Ed. Note.—For cases in point, see Cent. Dig. vol. 25, Habeas Corpus, § 58.]

2. SAME—RIGHT TO WRIT—ORDER OF COURT.
Under Code Civ. Proc. § 2020, giving an absolute right to the writ of habeas corpus, no special order of court is necessary for its issuance.
[Ed. Note.—For cases in point, see Cent. Dig. vol. 25. Habeas Corpus, § 55.]

3. PROCESS—WRITS—ALTERATION.
Under the express provisions of Code Civ. Proc. § 727, a writ or order of court when once signed should not be changed in the slightest degree by any person into whose hands it comes, without the court's express authority.

4. HABEAS CORPUS—ALTERATION OF WRIT—EFFECT.
Where, after the issuance of a writ of habeas corpus, relator's counsel changed the name intended for relator in two places in the writ to correct a mistake, and make the writ consistent throughout, such change did not invalidate the writ; since it was either within the implied authority of counsel to make the writ conform to the intent of the justice issuing it, or, if it was a material alteration made without authority, it was the act of a stranger to the writ, and therefore did not affect the writ as originally issued.

5. ALTERATION OF INSTRUMENTS—IMMATERIAL CHANGE—CHANGE BY PARTIES—EFFECT.
If a change is made by one of the parties to an instrument after its execution, but its legal import remains the same, the alteration is not fatal, in the absence of a statute declaring such to be the effect.
[Ed. Note.—For cases in point, see Cent. Dig. vol. 2, Alteration of Instruments, § 4.]

6. HABEAS CORPUS—WRIT—FORM—OBJECTIONS—WAIVER.
Failure of relator to incorporate in a petition for a writ of habeas corpus all the matters specified in Code Civ. Proc. § 2019, was waived by respondent's appearing and filing a return to the writ, instead of moving to quash.

7. SAME—FEES—UNDERTAKING.
Where no objection was made when a writ of habeas corpus was served that no fees were tendered to respondent, and no undertaking was given as required by Code Civ. Proc. § 2000, and respondent finally obeyed the writ without production of either fees or undertaking, he could not object that the writ was invalid for that reason.

**8. SAME—WAIVER.**

Code Civ. Proc. § 2000, requiring relator in a writ of habeas corpus to pay certain fees and give an undertaking to the respondent, is for the sole benefit of the latter, and may therefore be waived by him.

**9. SAME—PRODUCTION OF PRISONER—TIME.**

Code Civ. Proc. § 2004, makes it the duty of the person on whom a writ of habeas corpus is served to obey, and make return to it according to the "exigency thereof." Section 2006 declares that when the writ is returnable forthwith, at a place within 20 miles of the place of service, the prisoner must be produced within 24 hours; and section 2027 declares that the person on whom the writ is served must bring up the body of the prisoner in his custody according to the "command" of the writ. *Held*, that the time specified in section 2006 was the maximum time only, and hence, where a writ required the production of the prisoner "forthwith and immediately," it was no excuse for the respondent's delay to afford an opportunity to photograph and measure the prisoner that he was produced within 24 hours.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 25, Habeas Corpus, § 74.]

**10. SAME—DISOBEDIENCE—PUNISHMENT—STATUTES.**

Code Civ. Proc. § 2028, provides that, where a person who has been duly served with a writ of habeas corpus neglects without sufficient cause fully to obey it, the court or judge before whom it was made returnable must forthwith issue a warrant of attachment for the delinquent, and commit him to custody until he makes return to the writ and complies with the order, etc. *Held*, that such section referred to a case where the respondent failed to make any return to the writ, and did not apply to one in which the default consisted in the method and manner of making the return.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 25, Habeas Corpus, §§ 72, 73.]

**11. SAME—EFFECT.**

Code Civ. Proc. § 2028, providing for punishment of a respondent disobeying a writ of habeas corpus, is not exclusive, and does not preclude the court from punishing respondent as for a contempt.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 25, Habeas Corpus, § 72.]

**12. SAME—NATURE OF WRIT.**

A writ of habeas corpus is a common-law writ, existing independent of statute.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 25, Habeas Corpus, § 1.]

**13. SAME—AUTHORTIY TO ISSUE—JUDGE IN CHAMBERS—CRIMINAL CONTEMPT.**

Under the habeas corpus act, a justice of the Supreme Court who issues the writ in chambers returnable before him at chambers being a branch of the Supreme Court, the disobedience of the writ may be punished as a criminal contempt, as though it had been issued at Special Term.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 25, Habeas Corpus, §§ 72, 73.]

**14. SAME—CIVIL CONTEMPT.**

Where, after relator had been admitted to bail before conviction, he was arrested by police officers and taken to police headquarters to be photographed and measured without authority, and, in order to prevent this, obtained a writ of habeas corpus which was served on respondent, in charge at police headquarters, requiring production of relator forthwith before he had been photographed and measured, but respondent delayed compliance with the writ until such proceedings had been completed, the writ constituted a special proceeding to preserve relator's personal liberty and immunity of his person, and hence respondent was punishable as for a civil contempt under Code Civ. Proc. § 14, subd. 8, providing that a court

of record has power to punish, by fine and imprisonment, or either. a neg-lect or violation or other misconduct by which a right or remedy of a party to a civil action or a special proceeding has been defeated, in any other case than those specified, where an attachment or other proceeding: to punish for a contempt has been usually adopted in a court of record to enforce a civil remedy or to protect the right of a party.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 25, Habeas Corpus, § 74.]

Proceedings to punish August Kuhne for contempt for disobeying a writ of habeas corpus issued on the relation of Frank Jenkins. Defendant convicted.

Stephen C. Baldwin, for relator.

Edward J. Lazansky, Asst. Corp. Counsel, William Rand, and Howard S. Gans, for respondent.

BURR, J. Upon the hearing of this application, the respondent seemed to be more concerned to discover alleged technical defects in the writ and the proceedings to punish him for disobedience of it than to meet the questions involved upon the merits. The technical questions will be first considered.

The respondent claims the writ to be void for two reasons: First, that it was not issued under seal; and, second, that material alterations had been made in it after the writ had been signed by the justice issuing the same. While the statute provides that such a writ must be issued under the seal of the Supreme Court (Code Civ. Proc. § 1992), the same statute also provides that the omission of the seal does not make the writ either void or voidable (Id. § 24). A writ of habeas corpus is a writ to which the petitioner has an absolute right. Code Civ. Proc. § 2020. It does not rest in discretion, as does a writ of mandamus, and no special order of the court is required before it issues.

The facts with regard to the alterations in the writ are undisputed, and are substantially as follows: Counsel for the petitioner in these proceedings, anticipating that earlier in the day one John G. Jenkins, Jr., might be indicted by the County Court, and anticipating that an effort might be made to photograph and measure him while in the custody of the County Court and waiting the adjustment of bail, prepared a typewritten petition for a writ of habeas corpus, and also a writ requiring the persons having the custody of the body of John G. Jenkins, Jr., to produce him forthwith and immediately upon the receipt of the writ before the justice issuing the same. The said John G. Jenkins, Jr., was arraigned, admitted to bail, and discharged, and no attempt was made to interfere with him. When the person of Frank Jenkins was seized under the circumstances hereinafter set forth, his counsel took the typewritten paper previously prepared, and in the petition struck out the words, "John G.," before the word, "Jenkins," and wrote in the word, "Frank," with a pen, and struck out the word, "Jr.," after the word "Jenkins." This petition was then verified. In the writ in the mandatory part thereof he struck out the words, "John G.," before the word "Jenkins," and inserted the word, "Frank," struck out the word, "Jr.," after the word "Jenkins,"

and in the closing part of the writ again struck out the same words and inserted the word "Frank." All this was done before the writ was submitted to the justice for signature. When signed, the writ read as follows:

"People of the State of New York. To the Police Officers or Other Persons in Charge of John G. Jenkins, Jr.: We command you that you have the body of Frank Jenkins by you imprisoned and detained as it is said, together with the time and cause of such imprisonment and detention by whatsoever name the said John G. Jenkins, Jr., is called or charged, before me, a justice of the Supreme Court, forthwith, and immediately upon the receipt of this writ at my chambers in the courthouse, in the borough of Brooklyn, city of New York, to do and receive what shall then and there be considered concerning the said Frank Jenkins, and have you then and there this writ."

At the police headquarters one of the counsel for Frank Jenkins observed the failure to change the words, "John G.," to "Frank," in the salutation clause of the writ, and also in the middle of the writ following the words, "by whatsoever name the said," and preceding the words, "is called or charged." Taking a pen in the presence of the respondent, he changed these words in the writ so as to make the language of the writ consistent throughout. These latter changes in the writ were not necessary. If the salutation clause of the writ had read simply "People of the State of New York. To the Police Officers," it would have been quite sufficient. The person upon whom the writ is served is deemed to be the person to whom it is directed, although directed to him by a wrong name or description, or to another person. Code Civ. Proc. § 2024. The mandatory clause of the writ commanded the person upon whom it was served to have the body of Frank Jenkins before the justice issuing the writ, to do and receive what should then and there be considered concerning the said Frank Jenkins. If the words, "by whatsoever name the said John G. Jenkins, Jr., is called or charged," had been entirely omitted, the writ would have been a good writ for the production of Frank Jenkins. If the person directed to be produced is described in any way so as to be identified as the person intended, the writ shall not be disobeyed for any defect of form. Id. 2024. While the act of counsel in making the changes above referred to was indiscreet and injudicious, it is manifest that it was not done with evil intent. A writ or an order of the court when it has once been signed should never be changed in the slightest degree by any person into whose hands it comes without the express authority of the court. Code Civ. Proc. § 727. But, if the changes were material, the respondent must choose one horn of the dilemma or the other. Either it was within the implied authority of counsel who had obtained the writ to change it so as to make it conform to the intent of the justice issuing the writ and to correct a palpable mistake therein, or such change was made entirely without authority and by a stranger to the instrument. If the former is the case, then the writ was not vitiated. 2 Cyc. 148; Clute v. Small, 17 Wend. 238; Hale v. Russ, 1 Me. 334. But, if the change was made without authority and by a stranger, such change has no effect upon the original writ. The paper then has no other or different meaning than it had before such change was made. 2 Cyc. 154; Martin v. Tradesmen's Ins. Co., 101 N. Y. 498, 5 N. E. 338. If a change

is made by one of the parties to an instrument, still, if the legal import and effect of the instrument remains the same after the alteration, such alteration does not vitiate it in the absence of a statute declaring such to be the effect. Prudden v. Nester, 103 Mich. 540, 61 N. W. 777; Krouskop v. Shontz, 51 Wis. 204, 8 N. W. 241, 37 Am. Rep. 817; Clapp v. Collins (City Ct.) 7 N. Y. Supp. 98; Leonard v. Phillips, 39 Mich. 182, 33 Am. Rep. 370; Derby v. Thrall, 44 Vt. 413, 8 Am. Rep. 389; Arnold v. Jones, 2 R. I. 345; Rudesill v. Jefferson Co., 85 Ill. 446. In this case from the petition and the mandatory portions of the writ, it is perfectly apparent that the person to be produced was Frank Jenkins. Any changes in the other portions of the writ to conform to the principal parts thereof and effect that intention were immaterial changes, and did not make the writ void.

It was also claimed that the writ was defective for failure to incorporate in the petition the various matters and things specified in section 2019 of the Code of Civil Procedure. Without determining whether the expression of one alleged cause of detention is an exclusion of all others, it is sufficient to say that this objection was waived by appearing and filing a return to the writ, instead of moving to quash the same. 21 Cyc. 314; McGlennan v. Margowski, 90 Ind. 150.

Objection was also made that the writ was not properly served because no fees were tendered to the respondent nor any undertaking given, as provided by section 2000 of the Code of Civil Procedure. Without deciding whether the provisions of that section apply to the respondent, and without deciding whether any such restrictions upon the power of the court to issue this writ are valid or invalid, it is sufficient to say that no objection was made when the writ was served to obeying the same upon that ground, and it was finally obeyed without the production of either fees or undertaking. This provision of the statute was solely for the protection of the person upon whom the writ was served, and like any other provision for his benefit might be waived. In the Matter of Clark, 168 N. Y. 437, 61 N. E. 769; People ex rel. McLaughlin v. Police Com'rs, 174 N. Y. 456, 67 N. E. 78, 95 Am. St. Rep. 596.

The respondent further contends that, even although the writ did require the production of the body of Frank Jenkins forthwith and immediately upon the receipt of the writ, the writ was obeyed, because, within a period of 24 hours after the writ was served, the prisoner was produced. Code Civ. Proc. § 2006. This provision of the statute must be read in connection with section 2004 of the Code of Civil Procedure, which makes it the duty of the person on whom the writ is served to obey and make return to it "according to the exigency thereof," and with section 2027 of the Code of Civil Procedure, which provides that the person upon whom a writ of habeas corpus is served must bring up the body of the prisoner in his custody according to the command of the writ. Where the writ requires an immediate production, and it is possible for the person to obey the writ before deliberately proceeding to do something else which it was the purpose of the writ to prevent, it cannot be said that this was making a return according to the exigency of the writ.

Further than that the section of the Code upon which the respondent relies was intended to specify only a maximum time beyond which an excuse for delay in obedience to the writ would not be considered. This is apparent if we consider the history of legislation, and the source from which the present words of the statute are derived. The codifiers took that provision of the Code from a provision of the Revised Statutes (2 Rev. St. p. 575, pt. 3, c. 9, tit. 1, § 85), and this, in turn, through the Revision of 1813, may be traced to an act passed on the 21st of February, 1787 (Laws 1787, c. 39). The preamble to that act recites that:

"Great delays have been used by sheriffs, gaolers and other officers to whose custody persons have been committed for criminal or supposed criminal matters, in making returns of writs of habeas corpus to them directly and by other shifts to avoid their yielding obedience to such writ contrary to their duty and the known laws of the land."

The act then provides that for the prevention of such abuses the prisoner shall be produced "according to the command of the writ," unless the commitment of the party be in a place beyond the distance of 20 miles from the place or places where such court shall be. If beyond the distance of 20 miles and not above 100, then within the space of 10 days. If beyond the distance of 100 miles, then within the space of 20 days, and not longer. When one considers the difficulties of transportation at that time and the language of the statute, it is clear that it was not intended to do anything more than fix a maximum limit for obedience, and not to confer on the person to whom the writ was delivered a "shift for delay" to the extreme of the time specified. A writ of habeas corpus "tolerates no delay except of necessity, and is hindered by no obstacle except the limitations set by the laws of its creation." People ex rel. Duryee v. Duryee, 188 N. Y. 445, 81 N. E. 315. But, even though the writ was a valid writ, although all defects in connection with it were waived, although it was properly served, and although it has not been obeyed in its letter, yet, if the disobedience was unintentional and not willful, and the respondent was actually mislead as to the person that the writ called upon him to produce, the court might hesitate to punish him for such technical disobedience. That the respondent knew precisely the person that the writ called upon him to produce and knew the purpose and object of the writ does not admit of dispute.

The testimony as to the circumstances attendant upon the issuing of the writ is uncontradicted, and is as follows: On the 26th day of November, 1907, the said Frank Jenkins, accompanied by his counsel, appeared before the County Court of Kings county, which was then in session, and through his counsel stated that he understood that an indictment had been found in that court charging him with the crime of forgery in the third degree. He surrendered himself to the custody of the court, and desired that bail be fixed. Bail was fixed, a bail bond prepared, the bail offered justified, and was approved by the court, and the prisoner was discharged. He left the courtroom in company with his wife, and, as soon as he ·reached· the street and when he was immediately in front of the courthouse, he was seized by two police officers connected with the central office in the borough

of Brooklyn. Although counsel protested, and informed these men that Mr. Jenkins had been released on bail by the County Court, he was dragged through the street to the police headquarters, a distance of five or six blocks from the courthouse. The writ of habeas corpus above referred to was then obtained from a justice of the Supreme Court, requiring the police officials having Mr. Jenkins in custody to immediately produce him before the justice who issued the writ at the courthouse in Brooklyn. At the police headquarters the respondent, August Kuhne, was in charge. In the presence of Mr. Jenkins, the writ was served upon him, and, after examining it, he directed his subordinates to take Mr. Jenkins upstairs and take his photograph. This was done, and certain measurements and impressions of his person were taken, with the admitted purpose of making them a part of the criminal records of the police department. After that had been done, and about an hour subsequent to the time when the writ was served, the said Kuhne produced Frank Jenkins at the courthouse before the justice who issued the writ. There is a dispute of fact as to what occurred at police headquarters when the writ was served. Mr. Baldwin, of counsel for the petitioner, states that when the writ was served upon Kuhne, he asked who made the alterations in the paper, and that he replied that they were made before the writ was signed; that he then stated (pointing to the prisoner then in the presence of respondent), "This is Frank Jenkins, the man whom the writ requires to be produced forthwith"; that he then asked Kuhne if he proposed to obey the writ, and that Kuhne violently threw the papers down on the desk, and said to his subordinates, "Take him upstairs and photograph him." Mr. Baldwin testifies that he then asked him if he knew what he was doing, and if he understood the responsibility which he was assuming, and he said, "Yes." This testimony of Mr. Baldwin is corroborated substantially by four reputable witnesses. The respondent says that, when the writ was served upon him, the statement was made, "Here is the writ of habeas corpus for this man"; and, when he asked who made the changes, that Mr. Baldwin said "he knew nothing about it." He denies that he threw the papers down upon the desk, denies that Mr. Baldwin pointed out the prisoner, and said, "This is Frank Jenkins, the man that you are to produce"; but testifies that, after Mr. Baldwin said he knew nothing about the changes in the writ, he turned and went out. The statement is so inherently incredible under the circumstances of the case that, if the overwhelming weight of evidence were not against accepting the truth of it, I should hesitate to do so. It is not corroborated by a single witness, although several members of the police force and a large number of other persons were present at the time. I am perfectly convinced that the respondent in this case in his endeavor to extricate himself from the difficulty in which he found himself committed willful and deliberate perjury on the witness stand in the examination held before me. That he was not misled is apparent from the fact that he did produce the body of Frank Jenkins after the purpose which he had sought to accomplish, and which he admits that he knew it was the design of the writ to prevent had been accomplished. That the conduct of the respondent in disobeying this writ was delib-

erate and intentional was also conclusively established out of his own mouth upon the witness stand. The said Kuhne admitted that he knew that the right of the police department to take the photograph and measurements of persons who had not been convicted of crime had been questioned. He knew that the counsel for Jenkins were trying to prevent this from being done until the right of the police department so to do had been determined. He was determined to defeat the purpose of counsel in this regard. He made no effort to ascertain about the validity of the writ, or whether he should produce Frank Jenkins or any one else in obedience to it, until after he had directed the said Jenkins to be taken upstairs at police headquarters, and photographed and measured. For the sake of defeating the purpose of the writ, and accomplishing his own purpose, he deliberately disregarded its mandate, in the hope that in some manner he might afterwards find an excuse for so doing.

While the respondent may not be charged for the conduct of any of the officers under his control prior to the time when the prisoner was delivered into his custody at police headquarters, the character of his conduct on that occasion may be considered in connection with his subsequent conduct in the same proceeding. After he had produced the body of Frank Jenkins in court, and after the court had insisted that he should make a written return to the writ, he signed a return entitled, "In the Matter of the People of the State of New York ex rel. John G. Jenkins, Jr.," against the police officials, in which he stated that at the time that the writ of habeas corpus was served upon him he did not have the relator in his custody, and that at no time whatever has he had the said relator in his custody. A more deliberate insult to the intelligence of the court could hardly be conceived. When objection was made to the receipt of such a return to the writ, he then signed another return, to the effect that he held Frank Jenkins then in court by virtue of a bench warrant issued by the district attorney of Kings county, which warrant he attached to his return. While it may be true that at the time that Frank Jenkins was brought before respondent at police headquarters he did not know that he had been arraigned, pleaded, given bail, and been discharged, and that the bench warrant which he referred to in his return had ceased to have any validity, he did know that such was the case at the time that he filed the return, for the statement had been made in open court in his hearing and assented to by the district attorney before any return was filed, and he immediately consented to the discharge of the prisoner. This second return was false and untrue, and known to him to be so at the time that he made it, and of itself was such disorderly, contemptuous, and insolent behavior in the presence of the court as would constitute criminal contempt. In re Stacy, 10 Johns. 328.

The respondent finally asserts that, even although he had deliberately and willfully disobeyed the writ served upon him, there is no power in the court before this application is pending to punish him therefor as for a contempt; and he bases this contention upon the grounds: First. That the habeas corpus statute provides other proceedings for the disobedience of such a writ. Code Civ. Proc. § 2028. It is

sufficient to say in this regard that the section cited has reference to a case where the respondent fails to make any return to the writ, and does not relate to a case where in the time, the method and manner of making the return the writ has been disobeyed. Moreover, even if the section might be deemed to cover the situation here presented, it is not exclusive, nor could the Legislature make it so, for the court has inherent power to vindicate its own dignity and punish defiance to its mandates, which is immune from legislative attack or control. Second. The respondent objects that he may not be punished as for a criminal contempt because the writ in question was not a lawful mandate of a court of record, but a mandate of a justice of the Supreme Court. A writ of habeas corpus is a common-law writ, and not a statutory one. If every provision of statute respecting it were repealed, it would still exist, and could be enforced. People ex rel. Tweed v. Liscomb, 60 N. Y. 559, 19 Am. Rep. 211. The entire dignity and power of the sovereign people of the state of New York are behind it to compel obedience to its provisions both in spirit and in letter. But under the provisions of the habeas corpus act a justice of the Supreme Court who issues the writ, even although he issues it at chambers and makes it returnable before him at chambers, is a branch of the Supreme Court within the meaning of the section of the statute above referred to precisely as much as in a regularly constituted Special Term of said court. It is a state writ issued in behalf of the people of the state. The seal of the Supreme Court is to be attached to it. Unless the justice of the Supreme Court issuing the writ of habeas corpus is in effect a branch of the Supreme Court for the purposes of this proceeding, then the writ becomes entirely inefficient at every season of the year, except when a Special Term or a Term of the Appellate Division of the Supreme Court within the judicial district where the prisoner is detained is actually in session. In the rural districts of the state this would suspend the writ of habeas corpus for the greater portion of the year, since to confer the power upon a justice of the Supreme Court to issue a writ, when he cannot compel obedience to its terms, is making a mockery of a most solemn and important proceeding.

I have great doubt whether it lies within the province of the Legislature, in view of the nature of the writ and the provisions both of the federal and state Constitutions, that a writ of habeas corpus shall not be suspended, except when, in cases of rebellion or invasion, the public safety requires it (Const. U. S. art. 1, § 9, cl. 2; Const. N. Y. art. 1, § 4) to put any restriction upon the power of the court either to issue or enforce obedience to the writ (In re Leggat, 47 App. Div. 381, 62 N. Y. Supp. 208; People ex rel. Bungart v. Wells, 57 App. Div. 140, 68 N. Y. Supp. 59). As Lord Esher says:

"It is not necessary to constitute a contempt of court that the contempt should be in court, or that it should be a contempt of a judge sitting in court. All that is necessary is that it should be a contemptuous interference with judicial proceedings in which the judge is acting as a judicial officer." In re Johnson, Law Reports 20 Q. B. p. 71.

But, if there was any question about the power of the court to punish as for a criminal contempt, clearly it exists to punish for a

civil contempt. In this case the right of the relator in this special proceeding to personal liberty and immunity of person and his remedy to preserve this have been defeated and impaired by the conduct of the respondent. The power of the court in such case to punish has been preserved by statute in every case where prior to the passage of the statute it had been usually adopted and protected. Code Civ. Proc. § 14, subd. 8.

It only remains to determine what punishment shall be inflicted upon the respondent in this case. The writ of habeas corpus is the most venerable of the state writs known to the law. Its origin is lost in antiquity, but it antedated Magna Charta. It is a writ so sacred that it alone of the great state writs is especially protected by provisions both of federal and state Constitutions. It is a writ so important that it alone of the state writs is by special provision of statute permitted to be issued on Sunday. The right to it is so absolute that a severe penalty is imposed upon any court or judge who refuses to grant the writ upon application of any person entitled thereto. A punishment in this case must be inflicted sufficiently severe to vindicate the dignity of this writ, and to impress upon the respondent and others the serious consequences of disobedience to it.

For the contempt of which the respondent has been guilty, I direct that he be committed to the county jail of Kings county, and there imprisoned for a period of 30 days, and that he be fined in the sum of $250, and that he be committed to the same jail and there imprisoned until such fine is paid, not exceeding an additional period of 30 days.