PEOPLE ex rel. WHITMAN, Dist. Atty., v. WOODWARD, Judge, et al.

(Supreme Court, Appellate Division, Second Department.  May 2, 1912.)

PROHIBITION (§ 17*)—PREMATURE ISSUANCE.

Though a justice of the Supreme Court in the county of Kings, on petition of one detained for trial in the Supreme Court in session in the county of New York, issues a writ of habeas corpus returnable before him, and though, under Code Cr. Proc. § 25, it may, because of such court being in session, be returnable only to such court, issuance of prohibition to the judge, depriving him even of opportunity to consider objection to his jurisdiction, taken after full appearance and pleading by the parties, even if proper in view of the remedy by appeal in case of erroneous determination by him, is premature; there being no intimation or presumption that he will not dismiss the proceeding or send it to the court in the county of New York.

[Ed. Note.—For other cases, see Prohibition, Cent. Dig. § 66; Dec. Dig. § 17.*]

Application by the People, on relation of Charles S. Whitman, district attorney of the county of New York, for writ of prohibition to the Honorable John Woodward, a justice of the Supreme Court, and Charles H. Hyde.  Heard on return of an alternative writ.  Application denied, and alternative writ vacated.

Argued before HIRSCHBERG, BURR, THOMAS, CARR, and RICH, JJ.

Charles S. Whitman, Dist. Atty., of New York City (Robert S. Johnstone, Asst. Dist. Atty., and J. Robert Rubin, Deputy Asst. Dist. Atty., both of New York City, on the brief), for relator.

Frederic R. Coudert, of New York City, for defendant Woodward.

Max D. Steuer, of New York City, for defendant Hyde.

THOMAS, J.  The Code of Criminal Procedure (section 25) provides:

"During the session of the Supreme Court in any county, no person detained in a county jail of such county, upon a criminal charge, shall be removed therefrom by writ of habeas corpus, unless such a writ shall have been issued by or shall be made returnable before such court."

Hyde, the respondent herein, was so detained for trial in the Supreme Court in session for the county of New York, and upon his petition Mr. Justice Woodward in the county of Kings issued a writ of habeas corpus returnable before himself.  The district attorney asserts that the writ was returnable only to the Supreme Court in the county of New York, while the petitioner therein urges that the statute, so far as it so commands it, violates the Constitution of the state (article 1, § 4) and of the United States (article 1, § 9, subd. 2):

"The privilege of the writ of habeas corpus shall not be suspended, unless when, in cases of rebellion or invasion, the public safety may require its suspension."

The privilege of this common-law writ is of such high value that no sensible impairment of it may be tolerated under the guise of either regulating its use or preventing its abuse.  If, then, the stat-

ute that gives the sole right to hear a writ to the Supreme Court in session where the prisoner is detained upon a criminal charge in any appreciable degree suspends the privilege as it existed at common law, it is void. But where at common law is found the right to apply during term time to any judge of the realm not only for the writ but also for the hearing of it? I am referred to no such privilege and find none, and will show that it did not exist. And yet the respondent herein should prove, if he would invalidate the statute, that such was the law of England before the enactment of the Habeas Corpus Act of Charles II (31 Car. II, c. 2); for that act in part reads:

"And to the Intent no Person may avoid his Trial at the Assizes or General Gaol-Delivery, by procuring his Removal before the Assizes, at such Time as he cannot be brought back to receive his Trial there; (2) Be it enacted, That after the Assizes proclaimed for that County where the Prisoner is detained, no Person shall be removed from the Common Gaol upon any Habeas Corpus granted in Pursuance of this Act, but upon any such Habeas Corpus shall be brought before the Judge of Assize in open Court, who is thereupon to do what to Justice shall appertain." Section 18.

Thereby the open court to which the prisoner was amenable had sole cognizance of the writ. But during the session of the court a judge had no jurisdiction even before the act of 1679. By the common law the writ issues "out of the Court of King's Bench not only in term time, but also during the vacation, by a fiat from the chief justice or any other of the judges, and running into all parts of the king's dominions. * * * If it issues in vacation, it is usually returnable before the judge himself who awarded it, and he proceeds by himself thereon, unless the term shall intervene, and then it may be returned in court." Chase's Blackstone, 687. Indeed, it was the denial of the power to issue the writ in vacation by Nottingham, Lord Chancellor, in the Jenks Case (1676) that influenced the passage of the act. Blackstone states (page 688) that in that case, "notwithstanding the most diligent searches, no precedent could be found where the chancellor had issued such a writ in vacation," and that in the same case "the chief justice (as well as the chancellor)" declined "to award a writ of habeas corpus ad subjiciendum, in vacation, though at last he thought proper to award the usual writs ad deliberandum, etc., whereby the prisoner was discharged at the Old Bailey." I make such reference to illustrate the limited power of the judge at common law in vacation to issue the writ, and what is due the statute in that regard. I would also show how dependent the remedy is upon the statute by tracing a little its history. Violation of the privilege is suspension of the writ. In 34 Elizabeth, 12 judges returned to her ministers the resolutions or articles (Anderson's Reports, p. 297), which, as Hallam says (1 Const. Hist. p. 379), "acknowledges the special command of the king, or the authority of the privy council as a body, to be such sufficient warrant for a commitment as to require no further cause to be expressed, and to prevent the judges from discharging the party from custody, either absolutely or upon bail." In reliance upon this precedent, or an erroneous report of it, the decision was made in the case of Darnel and others (3 Car. I,

1627), to whose writ was made return by the warden that they were detained by warrant of the privy council, informing him of no particular cause of imprisonment, but that they were committed by the special command of the king. 1 Hallam's Const. Hist. p. 376. The prisoners were remanded. "It was evidently the consequence of this decision [I continue the words of Hallam] that every statute from the time of Magna Charta, designed to protect the personal liberties of Englishmen, became a dead letter, since the insertion of four words in a warrant (per speciale mandatum regis), which might become matter of form, would control their remedial efficacy." This decision led to the enactment of the Petition of Right (3 Car. I), notwithstanding which "in the following year Mr. Selden and others were committed by the Lords of the Council, in pursuance of his majesty's command, the decision wherein, as Blackstone states, 'was heard with indignation and astonishment by every lawyer present,' and he adds: 'These pitiful evasions gave rise to the statute of 16 Car. I, c. 10, § 8, whereby it was enacted that if any person be committed by the king himself in person, or by his privy council, or by any of the members thereof, he shall have granted unto him, without any delay, upon any pretense whatsoever, a writ of habeas corpus, upon demand or motion made to the Court of King's Bench, or Common Pleas.'" In face of such statutory aid, in the Jenks Case the chief judge and chancellor found in their alleged disability in vacation a device to defeat the writ (Hallam's Const. Hist. 20), and there followed in 1679 the Habeas Corpus Act of Charles II, "the noble enactment" (says the historian Knight), which made that clause of the Great Charter which secures the personal liberty of every Englishman a living principle, instead of a dead letter, adding that "the strictness and promptitude of the proceedings under" it "struck the old weapon of tyranny out of the hands of the powerful." Blackstone says of it:

"The oppression of an obscure individual gave birth to the famous habeas corpus act (31 Car. II, c. 2), which is frequently considered as another magna charta of the kingdom; and by consequence and analogy has also in subsequent times reduced the general method of proceeding on these writs (though not within the reach of that statute, but issuing merely at the common law) to the true standard of law and liberty." Page 691.

And he later adds:

"But, even upon writs at the common law, it is now expected by the court, agreeable to ancient precedents and the spirit of the act of parliament, that the writ should be immediately obeyed, * * * by which admirable regulations, judicial as well as parliamentary, the remedy is now complete for removing the injury of unjust and illegal confinement."

I have not written this brief history to controvert Mr. Hallam's view that the habeas corpus act of 1679 "introduced no new principle nor conferred any right upon the subject" (although it should be noticed that it made a general charge of treason or felony bailable), but rather to illustrate its remedial efficiency, for, as Hallam says:

"The remedies of the habeas corpus act are so effectual that no man can possibly endure any long imprisonment on a criminal charge, nor would any minister venture to exercise a sort of oppression so dangerous to himself."

And he notices that in cases not covered by the act the "judges of the King's Bench, since the statute, have been accustomed to issue this writ during the vacation in all cases whatsoever." 3 Hallam's Const. Hist. pp. 19, 21. And yet it is a portion of this exalted and beneficent act which the respondent herein would condemn· as suspensory of the writ, although it furnished through the following centuries a rule of judicial administration in England, and was embodied in our statutes in 1787, and has been continued to the present time. Laws 1787, c. 39, § 11, p. 374; Laws 1801, c. 65, p. 123; 2 R. S. § 27, p. 758; Revised Laws of 1813, c. 57, par. 8, p. 356; Laws 1892, c. 686, § 99 (not applicable to the county of New York); Code of Criminal Procedure, § 25, amended by Laws of 1909, c. 66, § 1. In this entire period I am advised of but one decision that has denied its authority, that of the special county judge in People ex rel. Perry v. Gillette, 66 Misc. Rep. 517, 124 N. Y. Supp. 420, whose order dismissing the prisoner was reviewed by the Appellate Division (140 App. Div. 27, 124 N. Y. Supp. 470), and affirmed by the Court of Appeals (200 N. Y. 275, 93 N. E. 953), but the present subject was not mentioned. As there is no precedent in the common law for a judge during term time making a writ returnable before himself for hearing; as the jurisdiction of the court as distinguished from that of the judge was such primary feature of the common law, as even to induce the action in the Jenks Case; as the present practice was declared as early as 1679 in the habeas corpus act, and since that time has been commanded by statute without judicial decision that it suspends the writ, save as noticed in the Gillette Case—how can it be said that section 25 of the Code of Criminal Procedure violates a constitutional privilege when it directs that it be made returnable to the court itself in session rather than to a judge thereof? But it may be said that the statute, not only denies the power of the justice to hear it in term time, but coerces its return before a particular branch of the court, and that at least the justice may optionally return it before the court, wherever in session, and that otherwise the "privilege" of the prisoner is invaded. At the outset I ask where at common law was it decided that the judge had that right or the prisoner that privilege? Is there an instance in the history of the common law where such right was claimed and adjudicated? The primary power was in the court of King's Bench, and to that the Supreme Court has succeeded. The court's jurisdiction is coincident with the state, and there may be concurrent sessions of it in several districts of the state, as there were concurrent sessions of the Court of King's Bench. So far as I am advised, no English subject ever asserted the right to have his writ returned wherever in the realm he would, and it may· be well reasoned that indignation would have followed had the writ been made returnable in a distant circuit, compelling the prisoner to pay at the rate of 12 pence per mile for transportation. Lilburne, tried for treason by an extraordinary commission of Oyer and Terminer in London (1649), declared that "no Englishman should be subjected· to any other Tryal than at the ordinary assizes, sessions, or gaol-deliveries." Such an ·abuse was recognized and precluded by the

federal Constitution that "the accused shall enjoy the right to a speedy  *  *  *  trial by an impartial jury of the state and district wherein the crime shall have been committed" (Const. U. S. Amend. 6), which, while not applicable to the courts of the state, indicates the sentiment that underlies our statute, that the trial shall be in the county where the indictment is found, with the power of removal upon the application of defendant in case an impartial trial cannot be had therein. It would similarly affront a sense of justice to permit a writ of habeas corpus to be returnable, wherever the justice would, thereby compelling the forthcoming there of the jailer with his prisoner at the latter's expense for going and perhaps for returning. It was for the very purpose of avoiding the burden cast on suitors. of traveling from distant places to the seat of the central court that circuits were formed and justices designated to hold appointed courts therein. A prisoner indicted in a particular circuit was expectably triable there, and, if the court was open, proceedings relating to the legality of his imprisonment were, according to practice, at least since the habeas corpus act, determinable at such court. It was a just, convenient, and unchallenged exercise of power to so direct, and the practice has been copied and used in our jurisprudence, with no dissent save as stated.

But it is urged that in People ex rel. Patrick v. Frost, 133 App. Div. 179, 117 N. Y. Supp. 524, it is decided that the Legislature could not by section 2017 of the Code of Civil Procedure compel a hearing of the writ at a term of the court where the prisoner is detained, as an alternative of a justice in any part of the state issuing it. Mr. Justice Gaynor issued the writ, and, although entitled to hear it himself, made it returnable at the Appellate Division (of which he was a member) held in another judicial district albeit in the same department. And in People ex rel. Collins v. McLaughlin, 60 Misc. Rep. 306, 113 N. Y. Supp. 306, Mr. Justice Bischoff (inadvertently so far as appears) at Special Term in the county of New York by writ caused a prisoner in Kings county to be brought to such court, where he was discharged, and of late in the Matter of Brandt, Mr. Justice Gerard followed a similar practice, and decided that it was within his power so to do. The distinction between a justice, as such, hearing the writ, and hearing it as a justice presiding in court, is quite technical, and the departure from the statute is a naked disregard of a rule of no intrinsic value, and a hearing in the appellate court rather than before a justice thereof was not in itself hurtful. Nevertheless, the learned justice in People ex rel. Patrick v. Frost was not moved by the parties to the discussion of jurisdiction, but was led to it by the interest of the question. For the reasons above suggested, I would, did the occasion require, deem the question worthy of reconsideration. But what was there said has negligible bearing upon the case at bar. In People ex rel. Patrick v. Frost the relator was in prison under a sentence, and no division of the court had immediate and appointed jurisdiction of him, while any justice had all possible jurisdiction as regards the writ. But it is not so in the case at bar. The court in session in New York, as

concerns Hyde, was charged with the jail delivery, and to such court, and such court alone, the prisoner was amenable, and to such court jurisdiction over him was given by the Constitution and the statutes of the state by designation thereto in the distribution of terms pursuant to recognized law, to which the Supreme Court in its entirety is deemed to have assented, conferring therefor all its supremacy.    In other words, the court was held as part of the authorized system of judicial administration for the very purpose of exercising all the powers of the Supreme Court in relation to the prisoner and others similarly situated.    To that division of the court was distributed the duty and power to make jail delivery, and under its sole cognizance the prisoner was brought.    It was, then, quite within the power of the Legislature to provide that, pending the sitting of the court so invested, all matters relating to his offense and detention therefor should be considered by such court.    To inquire into the validity of his detention, whether by moving to quash the indictment at or before trial or on return of a writ of habeas corpus, was alike within the purpose of the appointment of the term.    It was an imposition of power in accord with what had been done, and what had been commanded by statute to be done in all the history of the state, and in England, as has been narrated.    I would add that this practice was respected in the Matter of Taylor, 8 Misc. Rep. 159, 28 N. Y. Supp. 500, and People ex rel. Phelps v. Fancher, 2 Hun, 226.    I may refer to People ex rel. Jenkins v. Kuhne, 57 Misc. Rep. 30, 107 N. Y. Supp. 1020, where in association with effective description of the writ and its inviolability there is significant respect expressed for existing legislation regarding it.    I consider the People ex rel. Tweed v. Liscomb, 60 N. Y. 559, 19 Am. Rep. 211, quite consonant with and helpful of the views that I have expressed, that the statutes give to the writ the remedial efficacy that it required.    In the opinion is an eloquent statement of the inherent vigor and efficiency of the writ, its immunity from curtailment by legislative action, all of which postulates all discussion of the subject.

But the immediate question is, What is said of statutory enactments?  The opinion does not deem them in derogation of the privilege of the writ, but rather in substantiation of it, for it is said:

"The statutes which have been passed in England from the time of Charles II (31 Car. 2, c. 2), and in this state from the time of its first organization, have not been intended to detract from its force, but rather to add to its efficiency.  They have been intended to prevent the writ being rendered inoperative, by increasing the facilities for procuring it, enlarging the class of officers having jurisdiction in respect of it, imposing penalties for refusal to grant it, or to obey it, and providing for a speedy return, and a prompt trial and discharge, of the person, if not held according to the law of the land.  3 Bl. Com. 135; Ex parte Watkins, 3 Peters, 193, 7 L. Ed. 650.  The earlier statutes of this state did not profess to deal with or regulate the common-law jurisdiction over this writ, which existed in the Supreme Court and Court of Chancery, but had respect only to the jurisdiction conferred by statute upon, and exercised by, judicial officers out of court.  * * *  Bringing the procedure in term time, as well as in vacation, within the same general rules, removes all doubt that the intent was that every court and officer having power to grant a writ of habeas corpus, and to pass upon the legality of an imprisonment, has and may exercise, in the forms prescribed by law, all the power exercised at com-

mon law by the Court of King's Bench in England, and the Supreme Court of this state, as the corresponding tribunal with us."

The section in question shares the validity of the statute with which it has been in long association.

I infer that, if Mr. Justice Woodward moved, as he in effect was, to dismiss the writ or to make it returnable as the statute requires, had he not been enjoined, would have reached the present conclusion, aided by the earnest discussion and industrious research that was furnished to this court. He was entitled to hear and determine such motion, and while, in case of denial, a review of his decision would necessarily await decision on the merits adverse to the people, yet such decision is not to be presumed. The right to review his final order existed by statute. Code of Civil Procedure, § 2059. The denial of the motion to dismiss or to send to the proper court would, as the people assert, result in an interlocutory order not immediately reviewable, and therein the harm is said to lie. The same possibility of legal injury is found in other actions or proceedings where the jurisdiction is challenged, and, if in such cases a writ of prohibition were in practice allowable, our system of review would be subverted. When it is considered how frequently made are the objections to jurisdiction in actions, in special proceedings, in proceedings before magistrates, and in varied causes litigated, it will be appreciated that a review by stated and usual methods is not only consonant with our procedure, but is demanded by the orderly conduct of courts. But there come occasions when judicial action is so abnormal as to escape the usual provisions for correction, and in such extremity the writ of prohibition is issuable. Such was People ex rel. Jerome v. Court of General Sessions, 112 App. Div. 424, 98 N. Y. Supp. 557, affirmed 185 N. Y. 504, 78 N. E. 149, where, after judgment, the recorder entertained a motion for a new trial for errors in the record. It is noticed that there was no provision for appeal from the possible action of the recorder, and the writ of prohibition only was available. The exigency of the event made a necessity that demanded the writ. But what I would enforce is that the recorder persisted in entertaining the motion. Mr. Justice Woodward has not so persisted, nor is there evidence or presumption that he will. The writ was issued on March 28, 1912, upon a petition that authorized it, and without such evidence in it of the session of the court in the county of New York as would require return to that court, although it may be said that judicial notice of the term should have been taken. On that day the counsel for the prisoner and people appeared before Mr. Justice Woodward and by consent an adjournment was taken to March 30th. But some arrangement was made for tentative return and traverse, and thereupon his representative stated that the district attorney desired to interpose a preliminary objection to the hearing of the proceeding by him on the ground that he had no jurisdiction to issue the writ compelling the production of the body of the prisoner before him in Kings county, in view of the provisions of section 25 of the Code of Criminal Procedure. "Mr. Justice Woodward thereupon stated that all motions and objections could be made at

the time to which the proceeding had been adjourned, and that no rights should be deemed to be waived, but that all the rights of all parties should be preserved." No evidence of the sitting of the court was produced to the justice. The issue was joined, all was left as if the parties would appear upon the stipulated adjourned day, and yet meantime proceedings for a writ of prohibition were taken and the justice enjoined from even granting what was equivalent to a motion by the district attorney. The justice could not dismiss or send the proceeding to the county of New York. During the long interval that elapsed, Justice Woodward has awaited the release from the present injunction to decide the proffered objection to his jurisdiction, and this court will not infer that he would make erroneous disposition of it. In the Brandt Case the learned district attorney, who now enjoins Mr. Justice Woodward, participated in what was probably at the outset an inadvertent violation of the statutory practice, and the possibility of such inadvertent disregard of technical rules in the multiplied judicial duties of the community renders it quite just that opportunity for correction should be afforded.

This application for a writ of prohibition is at least premature—a writ in any case issuable only in case of necessity and the absence of other adequate remedy. But it is sufficient to say that it should not issue against the learned justice from whom opportunity to consider the objection to his jurisdiction, taken after full appearance and pleading by the parties, was withheld.

The application for the writ is denied and the alternative writ vacated.

Application for writ denied, and alternative writ vacated, without costs.

CARR, J., concurs. BURR, J., concurs in separate memorandum. HIRSCHBERG and RICH, JJ., concur in result, the latter in separate memorandum.

BURR, J. I concur. I should not attempt to add anything to the opinion of my Brother THOMAS but for the fact that upon the oral argument it was contended that this court by its opinion in People ex rel. Patrick v. Frost, 133 App. Div. 179, 117 N. Y. Supp. 524, had, in effect, determined that there was no legislative control of the procedure relative to the writ of habeas corpus. I do not so understand its language. It is doubtless true that anything that is essential to the full benefit or protection of the right which the writ is designed to safeguard is "beyond legislative limitation or impairment"; but the method of securing that right "is one of legislative cognizance which is subject to any change that does not trench upon the fundamental right." People v. Cosmo, 205 N. Y. 91, 98 N. E. 408. For the reasons clearly pointed out in said opinion, the statute here considered tends to protect rather than to trench upon the fundamental right. Upon further reflection, it seems to me that the words in the opinion in the Patrick Case, that "this term of this court is not held within the judicial district where the prisoner is detained," is susceptible of a different construction from that for which contention is

made. If the expression in the statute, "within the judicial district where the prisoner is detained," refers to the place where the court was actually in session, then such construction may be justified; but, if these words refer to the territory over which the Appellate Division of the Second Department had special jurisdiction (Code Civ. Proc. §§ 219, 220), then it is not. It seems to me that the words of the statute are capable of the latter construction. But be that as it may, so far as express words are concerned, section 2017 of the Code of Civil Procedure relates to the persons or courts to whom the application for the writ is made, and not to the persons or courts before whom it should be returned. In the Patrick Case the writ was issued by a judicial officer mentioned in the section under consideration.

RICH, J. I concur in the result. Mr. Justice WOODWARD in making the writ returnable before himself followed the practice approved in People ex rel. Patrick v. Frost, 133 App. Div. 179, 117 N. Y. Supp. 524, and in the Matter of Brandt. When a rule of procedure is based on such recent and controlling authority, it should not be the subject of a review by a writ of prohibition, but should be tested in the ordinary way through an appeal from any order which the justice might make after a hearing before him.